

Litigation
Summer, 2007

From the Bench

## *3 A CASE FOR JURY QUESTIONNAIRES

Barbara M.G. Lynn [FNa1]

U.S. District Court, Northern District of Texas

Copyright © 2007 by the American Bar Association; Barbara M.G. Lynn

WESTLAW LAWPRAC INDEX

JUD--Judicial Management, Process & Selection

    I am an unapologetic believer in jury voir dire. I am convinced that it helps eliminate jurors whose views could make their participation in deciding a case either unfair in fact or subject to the perception of unfairness. Were I presented with the option of arbitrarily selecting and seating jurors, with peremptory challenges eliminated, I would immediately decline because I believe that a controlled voir dire process, with participation by the judge and the advocates, serves the interests of justice and improves the experiences of those summoned to serve.

    The jury system has remained a cornerstone of our justice system in large part because it is perceived to be fair and open. It will continue to flourish only if fairness and openness are preserved and if the experience of jury service is made as rewarding as possible for potential jurors. Toward these ends, I advocate for the use of jury questionnaires in all cases, not just in high-profile cases. I proceed from the premise that the exercise of peremptory challenges will remain a part of the process of jury selection.

    I use a standard questionnaire in every civil and criminal jury case I try. In lengthy or high-profile cases, I typically mail the questionnaire to potential jurors in advance and make copies of the responses for the lawyers, subject to their agreement not to duplicate them and to return all copies to the court after jury selection. Assuming that I have a large enough panel to do so, I allow the lawyers for the parties, based on the responses, to agree on the striking of certain jurors before the venire is required to appear, so that those prospective jurors need not report. I also rule on motions to strike for cause based on the questionnaire responses, for the same reason. This

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

approach eliminates unnecessary inconvenience for prospective jurors who would otherwise be excused for cause only after making a trip to the courthouse.

There are logistical issues to consider. The questions must be simple and easy to understand and the questionnaire not too long. Except in highly unusual cases, four pages is sufficient, but in a very high-profile case, a substantially longer questionnaire may be necessary. For example, in *United States v. Lay and Skilling*, Judge Lake submitted a 14-page questionnaire to the jurors, giving them six weeks to respond. The questionnaire should be enclosed with a cover letter signed by the court, explaining that the information sought is important and that it must be supplied directly by the prospective juror unless a disability prevents that person from writing or typing his or her own answers. The letter should emphasize that the prospective juror should not worry about spelling or grammar but should answer to the best of that person's ability. Where a disability requires the prospective juror to have assistance in responding to the questionnaire, the reason assistance is required and the name of the person assisting should be supplied. If the prospective juror does not communicate well enough in English to respond to the questionnaire, he or she should have the option to state that fact in lieu of responding in English and then answering in his or her preferred language if desired, although the court **\*4** may not have access to all necessary translators to interpret such responses. The judge should provide an estimate of how long the questionnaire should take to answer and a deadline when it should be returned. Before sending the **questionnaires**, the judge should consider whether the parties, rather than the court, should pay the cost of copying and mailing.

The prospective juror who filled out a mailed questionnaire should be required to sign the questionnaire, under oath, confirming that he or she responded to the questionnaire or identifying the person who did. As did the court in *California v. Jackson*, No. 133 603 (Cal. Supreme Ct. 2004), the judge should also make such assurances about juror confidentiality as are appropriate. The clerk will be required to follow up with those prospective jurors who do not return questionnaire responses. The lawyers will have several days to review the responses.

In the usual case, where **questionnaires** are not mailed, I have the venire fill out the **questionnaires** in the central jury room. About one week before the venire is to report, I furnish my standard questionnaire to counsel for review and comment, and I consider modifications upon request. Often, counsel request the addition of a series of questions seeking more detail about either the work history of the venirepersons, or their views on particular subjects that might be germane to the issues in the case (e.g., how they feel about tort reform or whether and why they have ever fired an employee). I usually make the requested modifications, as long as they are not argumentative and do not unduly lengthen the questionnaire.

In my experience, the process of having the venire fill out the questionnaire at the courthouse takes, on average, one and one-half to two hours. After the clerk has checked to make sure that each panelist has signed the completed questionnaire and filled out the front and back of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

each page, I give the attorneys approximately 20 minutes to review the responses before we commence voir dire.

The standard questionnaire I use asks potential jurors to provide the following information: the counties and zip codes of their current and prior residences; whether they rent, own, or live with a family member; their and their spouses' work history; age and employment of their children; educational background; hobbies, clubs, and interests; newspapers, magazines, and books read; military service; television shows regularly watched; prior jury experience; union membership; people most and least admired; legal and law enforcement training; and experience with litigation. In an article published in *Esquire* magazine in 1936 in which he made some ironic and satirical comments about jury selection, renowned lawyer Clarence Darrow articulated his view that a juror's "nationality, his business, religion, politics, social standing, family ties, friends, habits of life and thought, the books and newspapers he likes and reads ..." are all important subjects for inquiry of prospective jurors by the parties' attorneys. Clarence S. Darrow, "Attorney for the Defense," *Esquire*, May 1936.

I used to ask jurors for their residential addresses and for the names of their children, but I have concluded that such questions are unduly intrusive, would not yield substantially useful material, could enable harassment of prospective jurors by the press, and could subject jurors to danger in a criminal case. In part as a result of research I conducted for this article, I now allow prospective jurors responding to **questionnaires** to designate as *private* any answers they regard as highly sensitive. The questionnaire has space for prospective jurors to supply any additional information they wish, but most leave it blank.

I also include two optional questions inquiring about religious and political preferences, if any. I estimate that at least 80 percent of the panelists answer the optional questions. I make them optional because I believe the answers provide information that adds to the totality of general information helpful to advocates in selecting jurors, but I regard the information as sufficiently personal that I should allow those panelists who object to decline to provide it. Were issues of religion or politics directly relevant to an issue in the case, I would require that the question(s) be answered. Judge Walton conducted voir dire on the political views of the venire in *United States v. Libby*, the obstruction case against Vice President Cheney's former chief of staff. In a suit challenging the constitutionality of mandatory religion classes in a penal institution, I would require the venire to answer questions about their religious preferences if any counsel requested that.

The questionnaire I use in a criminal case also inquires whether the venirepersons have been victims of a crime or accused of a crime, or whether a family member or close friend of the potential juror has been convicted of a crime and, if so, whether each such person was imprisoned. I estimate that about a third of any particular venire have a family member or close personal friend who was convicted of a crime, and many have a family member or close friend in prison at the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

time of the trial.

In my experience, a questionnaire provides a much more comfortable means than does oral examination for potential jurors to provide information to the parties and the court. A venireperson who has a child in prison for a drug offense would much prefer answering a question about that in writing than standing up in open court to discuss it. I have found that the lawyers can in most cases follow up on a questionnaire answer about such matters without necessarily detailing the information furnished by the prospective juror in the presence of the rest of the venire. For example, the follow-up might proceed in this way: "Ms. Jones, I note your reference to your nephew in your answer to Question 7 [which inquires if a relative has been convicted of an offense, in response to which the juror describes her nephew's conviction for drug trafficking]. When did that occur? Where was it? Was there a conviction? Was there a prison sentence? If so, what was it?" Any more-detailed follow-up that is necessary can take place away from the rest of the venire, but in my experience that is rarely required. The lawyer's oblique references to the juror's particular circumstances may eliminate the necessity for an inquiry of the juror away from the rest of the venire, thus saving time while minimizing the risk of potential embarrassment.

Questionnaire responses also provide more information, in a faster and more organized way, than could be gathered in a reasonable amount of time by questioning in court, and mitigate the very real problem of jurors miming one another's answers, which often occurs in voir dire. *See generally* G. Thomas Munsterman *et al., Jury Trial \*5 Innovations* (2d ed. 2006). The responses give counsel and the court substantial information on which a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), or *J.E.B. v. Alabama*, 511 U.S. 127 (1994), can be asserted and evaluated, and also tend to limit stereotyping as a basis for jury selection based on a juror's appearance.

In my experience of using **questionnaires** for the last seven years, only a handful of potential jurors have objected to responding to questions asked orally or in writing. The reaction of most potential jurors can be contrasted with the resistance of a juror in *Brandborg v. Lucas*, 891 F. Supp. 352 (E.D. Tex. 1995). In *Brandborg*, which involved a capital murder trial, the mailed questionnaire contained 110 questions. Brandborg objected to responding to 12 questions-including questions about her family income, religious preferences, political party, television shows and movies watched, volunteer work done, cars driven, medical circumstances, and interest in guns and gun clubs-but was ordered by the state trial court to respond. After declining, she was held in contempt, excused from jury service, and ordered to pay a fine and serve three days in jail.

She then filed a federal habeas petition, claiming a constitutional right of privacy. The federal judge noted that "public access may, and often does, present a potential intrusion upon the juror's expectation of privacy which must be protected by the court." 891 F. Supp. at 356. In granting the petition, the federal court emphasized that potential jurors have a privacy interest

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

and that such an interest must be balanced against the competing rights of the public to an open proceeding and of the defendant to a fair trial as guaranteed by the Sixth Amendment. In balancing those interests, the federal court found that, when a relevant question calls for information a juror considers to be private, trial courts should screen questions for relevance, give the parties an opportunity to demonstrate the relevance of questions the judge proposes to screen out, and then consider the least-intrusive means to protect a juror's privacy. The court in *Brandborg* stressed that the questions must be "reasonably calculated to discover an actual and likely source of prejudice" and found that the questions objected to were not so calculated. *Id*. at 360 (quoting *United States v. Robinson*, 475 F.2d 376, 381 (D.C. Cir. 1973)).

Frankly, it is hard to articulate why most of the standard questions I submit are directly relevant to any particular litigation. *See* Michael Stevens, "Treat Jurors Respectfully," *TLR Advocate*, Dec. 2006, at 1 (criticizing the use of general juror questions); "Jury Selection Should Be Focused on Seating Fair and Impartial Jurors," *TLR Advocate*, Dec. 2006, at 6-7 (same). General questions about prospective jurors are designed, on the Darrow model, to provide lawyers an informed basis for exercising their peremptory challenges. Although the law gives the trial court significant discretion, when a juror objects to answering particular questions that can reasonably be deemed private and are at best marginally relevant, the court must either decline to require that an answer be given or seal the portion of the proceeding when it is answered. A contempt finding is unlikely to be sustained if a potential juror declines to respond, particularly in public, to a clearly irrelevant question.

Assuming that peremptory challenges and voir dire remain a part of our system, jury **questionnaires** provide a wealth of information and further jurors' privacy interests when compared with open disclosure in court. What jeopardizes jurors' privacy interests, beyond the limited disclosure to the court, the parties, and the other jurors, is the risk that the information they provide in a detailed questionnaire may be disclosed more broadly, particularly through publicity generated by the media.

The American Bar Association's *Principles for Juries and Jury Trials* addresses the issue of juror privacy in Principle 7. It provides that judges should ensure that "jurors' privacy is reasonably protected" and suggests that jurors should be informed "that they may provide answers to sensitive questions privately to the court, and the parties." American Jury Project, *Principles for Juries and Jury Trials* 8-9, (2005). The Comment to Principle 7 stresses that juror participation and candor during jury selection will be fostered by the court's attention to preserving reasonable privacy interests of the jurors.

The reality is that, except in high-profile cases, voir dire is rarely covered by the press. In contrast to voir dire, questionnaire responses have an obvious permanence that makes it relatively easy for the public and the press to acquire them with minimal expenditure of resources and effort. It is not unlikely that questionnaire responses in the court's file may be obtained by

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

others, and the information may then be reported or made available to individuals who might have a particular interest in the venire's or jurors' personal information. Such a result is inconsistent with jurors' interests in maintaining the privacy of their responses.

To analyze how to preserve juror privacy interests, we must assess significant *6 decisions in the area of public access to trials. In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), the Supreme Court concluded that the trial court erred in eliminating the public's access to a criminal trial, holding for the first time that the First Amendment, viewed in light of history and tradition, protects a right of public access to criminal trials. The media has at least as substantial a right of access to criminal trials as does the general public. The right of access is not absolute, but a trial judge who limits access to a trial must do so in a way which will not deny or unwarrantedly abridge such access. The logic of *Richmond Newspapers* was quickly extended by courts to civil trials as well.

Courts have had to wrestle with various restrictions on public access to trials. In *Press-Enterprise Co. v. Superior Court (Press-Enterprise I)*, 464 U.S. 501 (1984), the Supreme Court reviewed a trial court's decision to close the courtroom during individual voir dire in a rape and murder case. The State had argued that if individual voir dire were open to the public, prospective jurors would not be candid in their responses, and Press-Enterprise urged that the public had an absolute right to attend the trial, including voir dire. The trial court agreed with the State and denied Press-Enterprise access to individual voir dire. The individual and general voir dire took six weeks, and public access was closed for all but three days of voir dire. After the jury was seated, Press-Enterprise sought from the court a transcript of the entire voir dire, but both the prosecution and the defense argued against production, seeking to protect the jurors' privacy. The court refused to provide the transcript. The Supreme Court reversed.

The case highlights three competing interests that are at varying degrees of tension in any criminal jury trial: the right of the accused to a fair trial, the right of the public to fair and open proceedings, and the right of the jurors to privacy. In reality, the rights of the accused to a fair trial and of the public to fair and open proceedings are two sides of the same coin. As the Supreme Court observed, "the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the voir dire which promotes fairness." *Id*. at 508. As it did in *Richmond Newspapers*, the Court stressed the historical openness of criminal trials in the common law tradition. Such openness not only provides "therapeutic value" to the community but also "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.; see also* Press-Enterprise *Co. v. Superior Court (Press-Enterprise II)*, 478 U.S. 1, 7 (1986) ("Plainly, the defendant has a right to a fair trial but, as we have repeatedly recognized, one of the important means of assuring a fair trial is that the process be open to neutral observers."). In *Press-Enterprise I*, the Court emphasized that any limitation on openness must be narrowly tailored to achieve the result sought. Alternatives to closure must be considered.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

In *Press-Enterprise I*, the Supreme Court also discussed efforts to provide prospective jurors with an opportunity to advise the trial court when any matter of inquiry would cause "embarrassment," so that the information could be provided on the record but in the presence of only the parties and the court. The judge would then have to determine if disclosure would infringe "a significant interest in privacy" and, if so, articulate why. A later-provided transcript could be sealed in part, or the name of the juror could be withheld to protect that privacy interest. The Supreme Court's fundamental objection to the trial court's closure order arose from the overbroad and unjustified scope of that court's order. Several of the concurring justices, notably Justice Marshall, stressed that the value of open proceedings is the most important value, and redaction of jurors' identifying information, rather than the substance of their responses, is the most that can lawfully be done. *Press-Enterprise I*, 464 U.S. at 520-21 (Marshall, J., concurring).

In *Press-Enterprise II*, the Supreme Court held that a criminal proceeding could be closed when the basis for closure was the accused's right to a fair trial and the trial court made specific findings that that right would be prejudiced by publicity, there was a substantial probability that closure would prevent that prejudice, and reasonable alternatives to closure could not adequately protect the defendant's fair trial rights. The Fourth Circuit applied *Press-Enterprise II* in the case of *In re South Carolina Press Association*, 946 F.2d 1037 (4th Cir. 1991), which involved high-profile charges of vote buying, bribery, and illicit drugs. All parties to the case realized the difficulty of selecting an impartial jury, and an extensive questionnaire was mailed to the venire, accompanied by the court's assurance that the **questionnaires** were confidential and would be destroyed at the conclusion of the case. The **questionnaires** were used extensively during voir dire. In concluding that the decision of the trial court to close the voir dire was not clearly erroneous under the "extremely unusual circumstances" presented, the court did not address whether the trial court could properly destroy the completed **questionnaires** and assure the venire of confidentiality in their responses.

The Fifth Circuit has been deferential to trial courts' creative approaches to protecting the interests of jurors as long as the media are not entirely excluded from the process. When the voir dire is kept generally open, appellate courts have sustained trial courts' decisions in high-profile criminal cases to keep the names and addresses of jurors from the press and to seal certain portions of the proceeding when jurors answer sensitive questions. See *United States v. Brown*, 250 F.3d 907, 910 (5th Cir. 2001); *United States v. Gurney*, 558 F.2d 1202, 1206 (5th Cir. 1997).

In many cases, such as *California v. Jackson* and *In re South Carolina Press Association*, trial courts have, as I have, ***57** promised jurors confidential treatment of their **questionnaires**. Those promises have often been a basis for affirmance of a trial court's declining to make such **questionnaires** available to the press. In my view, however, *Press-Enterprise I* and *II* may stand for the proposition that such confidentiality is not in fact guaranteed when the press seeks the **questionnaires**, so that judges should always give jurors an opportunity to designate what they

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

regard as particularly private in case wholesale restrictions on access to the **questionnaires** are not sustained.

Closing the entire process of jury selection is unlikely to be sustained unless the court finds and details a substantial probability of prejudice to the defendant's right to a fair trial if the voir dire process is open. See ABC, Inc. v. Stewart, 360 F.3d 90, 104-05 (2d Cir. 2004). The fact that a case involves a well-known defendant, like Martha Stewart, is not in and of itself enough. In the routine case, a general, unparticularized concern for juror privacy is not likely to justify closing substantial parts of the voir dire. Further, a transcript is not considered a satisfactory substitute for the "ability to see and hear a proceeding as it unfolds [which] is a vital component of the First Amendment right of access-not ... an incremental benefit." Stewart, 360 F.3d at 99.

For the protection of juror privacy to have any real meaning, a court should have the ability to maintain juror anonymity even after the case has been decided. Judges have asked jurors whether they wish to remain anonymous at the end of a trial and given jurors the option to waive that anonymity later should they so desire. Brown, 250 F.3d at 920. This approach enhances jurors' trust in the judicial system and relieves at least one potential burden of serving as a juror.

In a high-profile capital murder case, the New Jersey Supreme Court considered two trial court rulings that limited publication of juror information and contact with jurors after a mistrial was declared due to the jurors' inability ***58** to reach a unanimous verdict. The *Philadelphia Inquirer* violated the trial court's order when it published the name of the jury foreperson and quoted her acknowledgment that she had been "staying with a friend" in Philadelphia. The *Inquirer* was investigating whether the juror lived in New Jersey and, thus, whether she was a qualified juror under state law. In State v. Neulander, 801 A.2d 255 (N.J. 2002), the court first vacated the trial court's order that "[n]either the identity nor descriptions that would reasonably identify any juror may be publicized, in any way, unless authorized by further Order," to the extent that the order restrained the use of juror information that was part of the public judicial proceedings. The court distinguished the case from others in which jurors' information was expressly treated as confidential during trial. The court upheld the trial court's order prohibiting post-verdict interviews of the jurors, at least until the case could be retried. The court found that the defendant's Sixth Amendment right to a fair trial could be violated by interviews of jurors from the hung jury.

These cases highlight the tensions among the three interests discussed throughout this article: those of jurors, defendants, and the public. Interest groups such as the Reporters Committee for Freedom of the Press, the American Society of Newspaper Editors, and the Society of Professional Journalists have each advocated unrestricted public access to judicial proceedings and juror information except in demonstrably unusual circumstances where the security of the participants is at risk.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Some states have adopted in their codes procedures utilized by trial courts for protecting jurors' privacy. For example, in criminal cases California requires that juror identification information, including names, addresses, and telephone numbers be sealed "[u]pon the recording of a jury's verdict in a criminal jury proceeding." Cal. Civ. Proc. Code § 237(a)(2). In criminal cases, the California approach adopts a presumption in favor of juror anonymity. The California code permits any person to petition the court for access to juror records. If the petition makes a showing of good cause, the court may set the matter for hearing, but can deny the petition without a hearing if the record reflects that there is a "compelling interest against disclosure." Id. § 237(b). A "compelling interest against disclosure" is defined to include, but is not limited to, "protecting jurors from threats or danger of physical harm."

California further protects jurors by requiring courts to provide notice to affected jurors-i.e., jurors whose information is sought. Id. § 237(c). Those jurors may appear in person, by telephone, or in writing to oppose the petition to release their personal identifying information. If a juror chooses to appear in person, the California code allows for the hearing to be closed to continue protecting the juror's anonymity. Finally, the statute requires that the "court shall sustain the protest of the former juror if, in the discretion of the court, the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure as defined in subdivision (b), or *the juror is unwilling to be contacted by the petitioner.*" Id. § 237(d) (emphasis added). The California approach, and the approach approved by the Fifth Circuit in *Brown*, place control over a juror's personal identifying information where it belongs: in the hands of the juror. To the extent that the public has an interest in the background or particular attributes of individuals serving on juries, however, the California approach does not limit access to voir dire or jury **questionnaires** but rather proscribes access to only personal information.

The Mississippi Rules of Criminal Procedure protect juror privacy by providing a procedure for the exclusion of the public from voir dire in "those rare cases where it is necessary." Miss. R. Crim. P. 26.02. In cases in which prospective jurors "may be asked sensitive questions that could be embarrassing to them," the court may advise the prospective jurors that they may request the exclusion of the public from that portion of the voir dire. Such a proceeding must be conducted on the record and with counsel and the defendant present. In deciding whether to exclude the public from voir dire, the court must balance the juror's privacy interests against the defendant's right to a fair and public trial and the public's interest in access to the courts. The court may order the closure of voir dire only "if it finds that there is a substantial likelihood that conducting the voir dire in open court would interfere with an overriding interest," either of a juror or of the defendant. If the court orders the closure of voir dire, the court must issue findings of fact indicating why the juror's or defendant's interests would be threatened by open voir dire, reviewing alternatives to closure explored by the **\*59** court, and explaining why such alternatives are inadequate in the case before it. The rule further requires that a record be made of all proceedings out of the public view but specifies that the court may order the transcript sealed or redacted in order to protect jurors' privacy interests.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

New York provides a form questionnaire approved by the court's chief administrator. As I do, the court may permit the questionnaire to be tailored, taking into account juror privacy interests. After jury selection is completed or a prospective juror is removed, the **questionnaires** are returned to the court and "discarded by court staff in a manner that ensures juror privacy." N.Y. Comp. Codes R. & Regs., tit. 22, § 202.33 (2006). In light of *Press-Enterprise I* and *II*, however, it is by no means clear that destruction of **questionnaires**, as opposed to sealing and retaining them in the court file, is appropriate. Principle 7 of the *Principles for Juries and Jury Trials* suggests that the records be maintained until the time for appeal has expired, and that jurors' names, addresses, and phone numbers be maintained as confidential and under seal unless the court finds good cause for disclosure.

Pennsylvania also provides a standard, confidential questionnaire to be completed and verified by each prospective juror in a criminal case. Pa. R. Crim. P. 632. Pennsylvania's rule also includes several procedures to protect juror privacy. First, the rule makes clear that the **questionnaires** are considered confidential and usable only for jury selection. Although the rule provides that attorneys shall be given a reasonable opportunity to review the **questionnaires** before voir dire and that the court may permit copies of the **questionnaires** to be taken from the courtroom for review, those copies are still considered confidential and may not be further duplicated, distributed, or published. Further, all copies must be returned to the trial judge at the end of voir dire for the trial judge to destroy. The rule provides that the original **questionnaires** of the prospective jurors not impaneled be destroyed upon completion of the jurors' service and that the original **questionnaires** of the impaneled jurors be retained in a sealed file and destroyed upon completion of the jurors' service, unless otherwise ordered by the court.

Concerns about juror privacy have taken on a new dimension with the rise and expansion of the modern media. Today's reporting, including immediate Internet access, turns even a local criminal trial into a national story. In 1984, when the Supreme Court decided *Press-Enterprise I*, CNN was only four years old, was the only 24-hour news station, and was available only to the relatively small number of households that subscribed to cable television. Now, cable television and 24-hour news stations are ubiquitous, and the Internet has exponentially increased the nationwide availability of news and information that in earlier times would have remained entirely local.

Juror **questionnaires** give judges a more precise tool to preserve an open jury system yet help to protect juror privacy in the modern media age. Instead of being forced to close portions of voir dire to the public when a particularly sensitive topic is at issue, judges can use a questionnaire to gather the information, and the lawyers can follow up with noninvasive questions during voir dire. **Questionnaires** have the added benefit of allowing judges to control the disclosure of jurors' personal information. **Questionnaires** can also be more easily and more precisely redacted than a voir dire transcript. Nondisclosure can be narrowly tailored to avoid providing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

sensitive information, thereby preserving juror confidentiality or anonymity, either by allowing the release of the substance of sensitive responses without identifying the name of the (actual or prospective) juror or by identifying (actual or prospective) jurors without providing their addresses and other sensitive information.

   Confidential juror **questionnaires** are an invaluable tool for ensuring both the integrity of the jury system for litigants-especially criminal defendants-and the improvement of jurors' experiences with that system. They allow attorneys to learn a significant amount about potential jurors, without significantly compromising jurors' interests in maintaining their privacy in truly personal matters, yet allow the press sufficient access to report on trials and our jury system. In these ways, jury **questionnaires** serve the fundamental goal of maintaining the viability of the jury trial-a critical part of our system of justice.

[FNa1]. *The author would like to thank Brian Collins of the law firm of Haynes and Boone for his help on this article*.

33 No. 4 Litigation 3

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.